,sUNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ANTHONY J. PROCHILO

                Plaintiff,

vs.                                             CASE NO: 2:06-cv-622-MMH-SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

## REPORT AND RECOMMENDATION[1]

_____This matter comes before the Court on the Plaintiff's, Anthony J. Prochilo, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. #1) filed on November 15, 2006. The Plaintiff filed his Memorandum of Law in Support of the Complaint (Doc. #12) on March 28, 2007. The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #13) on April 27, 2007. Thus, the Motion is now ripe for review.

      The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

1

# FACTS

## *Procedural History*

By decision dated January 29, 1993, the Plaintiff was found to be disabled as of July 15, 1991, due to the medical severity of the Plaintiff's impairments. (Tr. 16). On August 1, 1996, the Plaintiff received notice that disability was to cease as of August 1996. (Tr. 45-47). The Plaintiff timely filed a Request for Reconsideration on August 16, 1996. On February 19, 1997, the Plaintiff's disability was determined to continue after a continuing disability review. (Tr. 16). This date is considered the comparison point date (CPD) against which the Plaintiff's subsequent medical condition as reflected in testimony and documentary evidence is evaluated to determine whether his disability ceased or continued. (Tr. 17).

Subsequently, the Plaintiff's disability ceased on October 2002, due to medical improvement. (Tr. 16, 29). The cessation of benefits was affirmed initially and upon reconsideration. (Tr. 16). The Plaintiff timely filed a request for hearing before an Administrative Law Judge of the Office of Hearings and Appeals. (Tr. 16). The case was scheduled for hearing on August 17, 2004, however, the Plaintiff failed to appear. (Tr. 453). A show cause order was issued and the Plaintiff responded. (Tr. 453).

A second hearing was held by video before the Honorable Richard Ouellette, Administrative Law Judge (ALJ) on January 5, 2005. (Tr. 447-450). The Plaintiff appeared without a representative and expressed a desire to proceed with Counsel. (Tr. 449). The ALJ continued the hearing for thirty (30) days to allow the Plaintiff to retain Counsel. (Tr. 450).

The hearing re-convened on March 16, 2005 before ALJ Ouellette. (Tr. 451-479). On August 25, 2005, the ALJ Ouellette issued an Order that indicated the Plaintiff has reached medical

2

improvement and is no longer precluded from performing a substantial gainful activity. (Tr. 17). The Plaintiff filed a Request for Review by the Appeals Council on September 13, 2005. (Tr. 10-12). On February 24, 2006, the Appeals Council denied the Plaintiff's request. (Tr. 5-8). Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

### *Plaintiff's History*

The Plaintiff was born on February 19, 1972. (Tr. 24). The Plaintiff was nineteen (19) years old at the alleged onset of disability, and was thirty-three (33) years of age at the time of the hearing. (Tr. 24). The Plaintiff has a high school education. (Tr. 24). The Plaintiff has a past relevant work history as a municipal street cleaner and maintenance worker. (Tr. 36). The Plaintiff alleges an onset disability date of July 15, 1991, due to an injury to the left knee. (Tr. 36).

### *Medical History*

The Plaintiff was nineteen (19) years of age at the time of his injury. (Tr. 214). On September 11, 1991, the Plaintiff presented to Dr. Robert Boyd of Massachusetts General Hospital for surgical repair on his left knee (Tr. 214-218). The preoperative diagnosis was left posterior cruciate ligament (PCL) tear and possible anterior cruciate ligament (ACL) tear. (Tr. 214). Postoperatively, the Plaintiff was found to have a left knee PCL and ACL tear. (Tr. 214). The Plaintiff tolerated the procedure well and there were no complications. (Tr. 216). As a result, the Plaintiff moved for and was awarded Disability benefits on January 29, 1993. The Plaintiff received these benefits through December 2002. (Tr. 17).

On July 16, 2002, Plaintiff presented to Sunil N. Lalla, M.D.F.C.C.P. for a consultative examination. (Tr. 299-300). The Plaintiff complained of right eye pain with associated throbbing and occasional visual disturbance and photophobia. (Tr. 299). The Plaintiff also complained of severe

chronic neck pain with associated bilateral upper extremity parathesias, constant headaches, shortness of breath with exertion and hot weather, bilateral knee joint pain, and constant pain in the left knee, intermittent in the right. (Tr. 299).   Dr. Lalla noted the Plaintiff smoked up to a pack a day since 13 years of age and drank approximately six (6) beers a day.  (Tr. 299).  Dr. Lalla noted that Plaintiff had difficulty with his gait, instability  without using the brace, and the Plaintiff was unable to perform heel to toe ambulation.  (Tr. 300).  Dr. Lalla also noted that the cranial nerves II-XII were intact and had a sensory decrease at the left lower extremity.  (Tr. 300).  The Plaintiff' s muscles were well built except the right knee showed atrophy and surgical scars, straight leg raising seated and supine caused lumbar pain.  Power was 5/5 in both upper extremities, 3/5 in left extremity and 5/5 right lower extremity.  (Tr. 300).   Fine manipulation tested including opening door handles, lifting paper was normal. (Tr. 300).  Dr. Lalla's impression/recommendation was that the  Plaintiff's cervical spin has shown dislocated vertebra  at C2-5 with nerve involvement. (Tr. 300).  Dr. Lalla noted that Vioxx use should continue and that Flexeril offered no benefit to the Plaintiff.  (Tr. 300).  Dr. Lalla also noted the Plaintiff's history of drug abuse with inpatient rehab, cholelithiasis and pancreatitis.  (Tr. 300).   Further,  Dr. Lalla's impression included left lower extremity chronic pain, numerous ligaments and meniscus tears, continue with leg brace; COPD, GERDS; and right retinal tear secondary to trauma, pending surgical intervention. (Tr. 300).

On September 10, 2002, the Plaintiff treated at Family Health Centers for shoulder and arm pain.  The Plaintiff's diagnosis was shoulder pain. (Tr. 312). The Plaintiff was to continue with the sling support, ice and Lortab.  (Tr. 312).

On October 7, 2002, the Plaintiff presented to Joseph J. White, Ph.D., for a psychological evaluation. (Tr. 331-333).  Treatment notes indicated the Plaintiff had gastric bypass surgery and at

age 28 was diagnosed with liver problems and emphysema.  The report also noted the Plaintiff was diagnosed with ruptured cervical disc at age 30. (Tr. 331).  The Plaintiff's psychiatric history includes drug abuse from age 9 to 24 and alcohol abuse from age 15 to present.  (Tr. 332).  At the age of 24, the Plaintiff went through an 18 month treatment program while incarcerated.  (Tr. 332).  The Plaintiff presented a flat, depressed affect.  (Tr. 332).  Additionally, the Plaintiff admitted '"past thoughts of suicide with at least one attempt." (Tr. 332).  The Plaintiff has an average IQ and was well oriented to time and place.  (Tr. 332).  The Plaintiff' showed poor attention, concentration and inadequate short term memory.  (Tr. 332).  Dr. Lalla opined the Plaintiff could only do 6 digits forward and 4 digits backwards and did not have the verbal abstraction ability necessary to interpret proverbs. (Tr. 332).  Dr. White's diagnosis was  Axis I: 309.00 Adjustment Disorder with Depressed Mood and 305.00 Alcohol Abuse: Axis 11: no diagnosis and Axis III Post Multiple Surgeries to His Left Knee, Stabbing in Right Eye With Poor Vision, Liver Problems, Emphysema, Ruptured Cervical Disc, Chronic Pain in Left Knee, Neck, both Arms, Right Shoulder And Chest. (Tr. 332).  Dr. White noted the Plaintiff helps take care of the kids, does house chores and cooks.  (Tr. 333).  He watches TV until bedtime about 1 to 2 A.M.  (Tr. 333).  The Plaintiff had restless sleep but a good appetite. (Tr. 333).  Dr. White's summary and conclusion was that the Plaintiff had a number of physical deficits and related depression. (Tr. 333).  Dr. White noted that Plaintiff's level of depression and alcohol abuse are considered to be barriers to his overall  functioning. (Tr. 333).

On November 19, 2002, the Plaintiff presented to Eduardo Gomez, M.D. with left knee chronic pain, PCL Laxity, and right knee pain.  Dr. Gomez' assessment was right knee possible lateral meniscus tear, internal derangement, and left knee mild chronic PCL laxity.  (Tr. 358).

On December 5, 2002, Plaintiff presented to Eduardo Gomez, M.D. with right knee pain

and left knee contusion. (Tr. 356). Dr. Gomez noted the Plaintiff continued with right knee pain as he favors the left the majority of the time." (Tr. 356). MRI results confirmed there was no significant medial meniscus tear. (Tr. 356). Dr. Gomez' assessment was that Plaintiff had a left knee contusion/abrasion and right knee patellochondromalacia and some synovitis. (Tr. 356).

On February 27, 2003, the Plaintiff presented to Family Health Centers for possible pancreatitis. (Tr. 424). The diagnosis was etohism, pancreatitis, heroin abuse, and tobacco abuse. (Tr. 424). The Plaintiff was encouraged to visit Alcoholics Anonymous (AA) at least every week. (Tr. 424).

On March 7, 2003, the Plaintiff presented to Family Health Centers for a follow-up appointment. The Plaintiff complained of ongoing back pain. (Tr. 423). Upon examination, the Plaintiff was found to have muscle tenderness. (Tr. 423). The diagnosis was chronic back pain. The Plaintiff was prescribed Vioxx and Ultram. (Tr. 423).

On September 18, 2003, the Plaintiff presented to Family Health Centers for shoulder pain The Plaintiff stated his shoulder hurt intermittently for two (2) weeks. (Tr. 422). The diagnosis was left rotator cuff tear. (Tr. 422). The Plaintiff was told to continue with Vioxx and heat. (Tr. 422). He was also "emphatically" urged to quit alcohol. (Tr. 422).

On August 28, 2003, the Plaintiff presented with right shoulder dislocation. (Tr. 406). Dr. Gomez' assessment was right shoulder recurrent dislocation, three episodes within one year. (Tr. 406). The Plaintiff was in an immobilizer for severe pain. (Tr. 406). The Plaintiff was ordered to have an MRI done as soon as possible. (Tr. 406).

On September 23, 2003, the Plaintiff presented for right shoulder pain. (Tr. 404). Dr. Gomez noted the Plaintiff continued subjective instability episodes. (Tr. 404). The Plaintiff was a

6

well developed, well nourished male. (Tr. 404). Physical examination to gross sensory motor testing was intact throughout. (Tr. 404). Examination confirmed local tenderness at the anterior acromion and to a lesser degree the AC joint. (Tr. 404). The Plaintiff underwent an infiltration of the subacromial space. Mild bursitis was noted. (Tr. 404). Additionally, the Plaintiff's MRI report confirmed rotator cuff tendinitis without evidence for tear. (Tr. 404). Mild bursitis was also noted. (Tr. 404). No evidence for significant instability, and no arthritis of that right shoulder. (Tr. 405). Dr. Gomez' assessment was right shoulder rotator cuff tendonitis and impingement. (Tr. 404).

On November 25, 2003, the Plaintiff underwent an MRI of the right knee. Results showed the medial and lateral collateral ligaments, cruciate ligaments, extensor mechanism, pes anserine tendon complex, iliotibial band, biceps femoris tendon insertion, popliteus tendon and paterllar retinaculum all had normal signal and configuration. (Tr. 413). The impression was "trace joint effusion, otherwise negative exam of the right knee." (Tr. 413).

On December 9, 2003, the Plaintiff presented to Dr. Gomez with right shoulder pain, bilateral knee pain. (Tr. 402). Dr. Gomez noted the Plaintiff complained of "quite a bit of pain, when it occurs, for a good couple of times a week now." (Tr. 402). Dr. Gomez also noted the Plaintiff continued to have left knee instability issues. (Tr. 402). The X-ray report revealed that left knee medial compartment osteoarthritis, progressing, through not significantly changed from his last visit. At the right shoulder, x-rays in the office confirm a type II acromion, well-preserved glenohumeral and subacromial joint space, normal bony architecture. (Tr. 403). Dr. Gomez' assessment was right shoulder recurrent instability and bilateral knee patellofemoral pain syndrome and synovitis. (Tr. 402). Dr. Gomez recommended physical therapy, predominately for the right shoulder instability. (Tr. 402).

On February 10, 2004, the Plaintiff presented to Dr. Gomez with right shoulder recurrent dislocation. (Tr. 400). X-rays showed no new bony abnormalities or fractures. The joint was reduced. (Tr. 400). Dr. Gomez' assessment was transient dislocation right shoulder recurrent. Dr. Gomez' plan included continued aggressive home strengthening exercises. (Tr. 400). Dr. Gomez noted that Plaintiff may ultimately require surgical capsular repair by a shrinkage technique for Barnkhart or ultimately an open repair. (Tr. 400).

On March 18, 2004, the Plaintiff presented to Dr. Gomez for bilateral knee pain. X-rays showed no change when compared to previous films. (Tr. 398- 399). Dr. Gomez' impression was bilateral knee pain with recent twisting injury. (Tr. 398).

On March 25, 2004, the Plaintiff underwent a MRI of the right knee. (Tr. 410-411). The bony structures were intact without fracture, contusion or mal-alignment. (Tr. 410). Dr. Gomez found the medial, lateral, collateral ligaments, the cruciate ligaments, and extensor mechanism have normal signal and configuration with the exception of minimal edema overlying the patella which may represent minimal prepatellar subcutaneous bursitis or direct contusion. (Tr. 410).

On March 30 2004, the Plaintiff presented to Dr. Gomez with right knee pain. (Tr. 396). X-rays of the lumbar spine confirm well-preserved disk heights and spinal alignment. (Tr. 396). Dr. Gomez' assessment was right knee pain, possible lumbar etiology and lower extremity radiculitis. (Tr. 396). Furthermore, Dr. Gomez suspected that the Plaintiff's lower back pain is the most likely cause of the Plaintiff's right knee pain and further evaluation with an MRI of his lumbar spine was warranted. (Tr. 396).

On March 30, 2004, the Plaintiff underwent a study of the MR Lumbar spine without contrast for low back pain. (Tr. 408). The impression was moderate central disc herniations L3-4, IA-5 and

8

W-S1 causing mild central canal stenosis; and mild multilevel facet and ligamentous hypertrophic changes. (TI. 408-409).

On July 20, 2004, the Plaintiff presented to Dr. Gomez with left knee pain. (Tr. 394). The Plaintiff reinjured his knee by slipping on a wet floor. (Tr. 394). The Plaintiff complained of pain, swelling, and tenderness to the touch laterally. (Tr. 394). X-rays revealed well preserved joint spaces on the right. (Tr. 394). On the left, joint spaces were no further narrowed from prior films, existing hardware was intact and in good position. (Tr. 394). Dr. Gomez' assessment of Plaintiff was left knee pain recurrent lateral sprain with contusion. (Tr. 394). Dr. Gomez' plan was to get the Plaintiff into some therapy. (Tr. 394). He was prescribed Vicodin but was told to use it sparingly. (Tr. 394).

On November 24, 2004, Plaintiff presented for a follow up from the Emergency Room. Plaintiff shot himself in the left foot with a gun. (Tr. 421).

On January 20, 2005, the Plaintiff presented to Dr. Gomez for a recheck of the left knee. (Tr. 417). The Plaintiff injured his knee slipping on an icy surface. (Tr. 417). Dr. Gomez noted he didn't actually fall but the twist resulted in immediate pain. (Tr. 417). Dr. Gomez noted that Plaintiff had diffuse tenderness along the joint lines as well as parapatellar. (Tr. 417). He also has some tenderness posteriorly. He has a I + effusion. (Tr. 417). Range of motion is very, very guarded. He could be coaxed into full extension, but hyperextension elicited significant pain. (Tr. 417). He has significant pain with flexion. The Plaintiff did not really tolerate any flexion beyond about 90 degrees and did not tolerate McMurray provocation. The Plaintiff seemed to have good stability to anterior, posterior, varus, valgus stress and was difficult to asses due to the significant guarding. (Tr. 417). The Plaintiff ambulated with a severely antalgic gait. (Tr. 417). Dr. Gomez' impression was left knee pain with advancing posttraumatic DJD. (Tr. 417).

9

On February 3, 2005, the Plaintiff was treated by Dr. Gomez for right knee pain status post fall. (Tr. 414). The Plaintiff reported that his left knee gave way, which caused him to fall with his full weight onto the front of his right knee. (Tr. 414). Upon examination, Dr. Gomez noted obvious swelling, 2 + from the knee with obvious ecchymosis over the anterior knee. (Tr. 414). Range of motion appeared well preserved, however, it was very difficult to assess fully due to extreme apprehension. (Tr. 414). X-rays confirmed well preserved joint spaces. (Tr. 414). Dr. Gomez' impression was right knee hematoma and contusion secondary to fall. (Tr. 414).

The Plaintiff treated with Florida Neurology Group from February 17, 2005 through March 23, 2005. (Tr. 425-435). The Plaintiff underwent a neurological consultations with Lane R. Carlin, M.D. On February 17, 2005, the Plaintiff reported playing basketball with his children, twisted and developed low back pain. (Tr. 433). The pain was in the lower lumbosacral spine and radiated down the back of his leg into his right buttock, and at times to the upper and mid thigh level. (Tr. 433). The Plaintiffs's medical history included Arthritis, depression, elevated cholesterol, eye disease, hypertension, tension headaches, and COPD. (Tr. 433). Dr. Carlin noted that Plaintiff sees flashing lights and wavy lines in the field of vision; complains of hoarseness; has bad periods of shortness of breath, notes occasional wheezing, notes moderate wheezing; degenerative joint disease symptoms present, notes muscle stiffness, notes back pain, has muscular pain, complains of muscle weakness; and has excessive thirst, has hot flashes. (Tr. 434). Additionally, Dr. Carlin noted that the Plaintiff had a negative straight leg raise. (Tr. 434). Dr. Carlin's impression was "Lumbar Back Pain, Mechanical." (Tr. 434). Furthermore, Dr. Carlin noted that the Plaintiff's presentation is most consistent with mechanical back pain. (Tr. 435).

On March 8, 2005, Dr. Carlin corresponded with Dr. John Fifer. Dr. Carlin noted the Plaintiff

had "a three week history of low back pain which was primarily right sided." (Tr. 427).  Further, Dr. Carlin noted that Plaintiff  finds that he is worse standing and sitting upright and better if he bends forward." Tr. 427).  Additionally, Dr. Carlin noted that Plaintiff continued to see flashing lights and wavy lines in the field of vision and complaints of hoarseness. (Tr. 427).  Dr. Carlin also noted that the Plaintiff continued to have  periods of shortness of breath, notes occasional and  moderate wheezing; degenerative joint disease symptoms present, notes muscle stiffness, back pain, muscular pain, complains of muscle weakness; and has excessive thirst, has hot flashes. (Tr. 428).  Dr. Carlin stated that the Plaintiff has negative straight leg raises. (Tr. 428). Dr. Carlin's impression was Lumbar Radiculopathy without Myelopathy. (Tr. 428).  Additionally, Dr. Carlin opined that it was likely mechanical but with ongoing pain and no improvement over the course of six weeks, despite conservative exercise and stretching, and radiation into the buttocks, and the fact that he has to sleep with the leg propped up and flexed at the hip at night, they decided to go ahead and image the back. (Tr. 428). Dr. Carlin prescribed Vicodin on March 8, 2005. (Tr. 429).

Additionally, on March 8, 2005, the Plaintiff underwent an MRI Lumbar Spine without contrast.  (Tr. 426). The MRI diagnosis was Lumbar Radiculopathy with Myelopathy. (Tr. 430).  On March 23, 2005,  Dr. Carlin  noted that the Plaintiff still  sees flashing lights and wavy lines in the field of vision; complains of hoarseness; has had periods of shortness of breath, notes occasional wheezing, notes moderate wheezing; degenerative joint disease symptoms present, notes muscle stiffness, notes back pain, has muscular pain, complains of muscle weakness; and has excessive thirst, and hot flashes. (Tr. 425).  Dr. Carlin's impression was Cervical Back Pain, Mechanical (724.5), Lumbar Back Pain, Mechanical (724.2). (Tr. 426).  The Plaintiff was to return on an as-needed basis. (Tr. 426).

11

On July 7, 2005, the Plaintiff returned to Dr. Gomez for increased left knee pain. (Tr. 442). Dr. Gomez noted continued instability. (Tr. 442). Upon examination, there was severe lateral laxity, 2 + varus instablility, 2 + anterior and posterior drawer, and moderate swelling. (Tr. 442). Medial joint tenderness was noted. (Tr. 442). The impression was left knee severe and persistent functional instability with pain and Osteoarthritis, left knee, post traumatic. (Tr. 442). X-rays showed a lateral femoral condyle and a more distal medial tibial screw consistent with prior ligament reconstructions. (Tr. 442). The Plaintiff has a ligament washer up on the femur. (Tr. 442). Dr. Gomez discussed replacing the Plaintiff's knee, both to stabilize and relieve Plaintiff's pain. (Tr. 442).

## Administrative Law Judge's Decision

Upon consideration of the record, the ALJ found the Plaintiff to be disabled within the meaning of the Social Security Act beginning July 15, 1991 under Title XVI of the Social Security Act. (Tr. 24). The ALJ found the Plaintiff has not engaged in substantial gainful activity since the alleged onset disability date. (Tr. 24). The ALJ found the Plaintiff's impairment as of February 19, 1997, the time of the most recent favorable medical decision, that the Plaintiff was disabled was rheumatoid arthritis and blindness and low vision. (Tr. 25). As of February 19, 1997, the Plaintiff was diagnosed with osteoarthrosis and allied disorders. (Tr. 25). The ALJ found the medical evidence established that as of October 2002, the Plaintiff did not have an impairment or combination of impairments, which met or equaled the severity of an impairment listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 25). The ALJ also determined, as of October 2002, there was improvement with respect to the Plaintiff's medical impairment and the improvement was related to the ability to to perform work. (Tr. 25). The ALJ also concluded that to the extent the claimant alleged symptoms since October 2002, which would prevent him from engaging in a wide range of light work, such

allegations are not credible.  (Tr. 25).  The ALJ noted that Plaintiff has been unable to perform his past relevant work as a manager of an automobile service station.  (Tr. 25).  The ALJ determined the Plaintiff, at the time of the hearing, was thirty-three (33) years of age and considered a younger individual with a high school education.  (Tr. 25).   The issue of transferability of work skills was not material to the decision.  (Tr. 25).  The ALJ, using Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, provides a framework for a conclusion that the Plaintiff considering his residual functional capacity, his age, education and work experience, has been capable, since October 2002, of performing other jobs which exist in significant numbers in the national economy.  (Tr. 25).  The ALJ further noted the vocational expert substantiated the conclusion.  (Tr. 25).  Therefore, the ALJ concluded that as of March 2002, the Plaintiff was no longer disabled under 20 C.F.R. §416.994(b)(6)(i)(B).  (Tr. 25).  Accordingly, the ALJ concluded the Plaintiff's disability ceased with October 2002 and his entitlement to Supplemental Security Income payments ended with the close of October 2002, in accordance with Sections 1614 (a)(3)(4) of the Social Security Act.  (Tr. 26).

## THE STANDARD OF REVIEW

### A.  Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards,  and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citingRichardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)). In evaluating whether an individuals disability continues, the ALJ must follow the

sequential inquiry described in the regulations.[2] 20 C.F.R. §§ 416.994(b)(2).  The Commissioner's

findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial

evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the

existence of a fact, and must include such relevant evidence as a reasonable person would accept as

adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d

1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982));

Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v.

Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004).  The District Court must view the evidence as

---

[2]The inquiry requires the ALJ to engage in a seven-step analysis, which will either preclude or mandate a finding of continued disability.  The steps are as follows:
*Step 1.*  Is Plaintiff currently performing substantial gainful activity.

*Step 2.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.

*Step 3.* If not has there been medical improvement as shown by a decrease in medical severity.

*Step 4.* If there has been medical improvement, is it related to the Plaintiff's ability to do work i.e., has there been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination?

*Step 5.* If medical improvement is shown to be related to Plaintiff's ability to do work, does the Plaintiff have the RFC to do past relevant work?

*Step 6.* If the impairment(s) is severe, does Plaintiff have the RFC to do past relevant work?

*Step 7.* If Plaintiff cannot perform work done in the past, does he have the residual functional capacity to perform other work, considering age, education, and past work experience?

14

a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67

F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must

scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment

for that of the [Commissioner]."Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206,

1210 (11th Cir. 2005).  If the Commissioner's decision is supported by substantial evidence, it should

not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

### B.  Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner

without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails

to provide the district court with sufficient reasoning to determine that the Commissioner properly

applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005)

(citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994));

Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  This Court may reverse the decision

of the Commissioner, and order an award of disability benefits, where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt. Thomas v. Barnhart, WL 3366150 *3 (11th Cir. December 7, 2004)

(citing Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)). The district court may also remand a

case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence

six of 42 U.S.C. § 405 (g); or under both sentences. Johnson v. Barnhart, 268 F. Supp. 2d 1317,

1321 (M.D. Fla. 2002) (citing Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir.

1996)).

"To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." Johnson, 268 F. Supp. 2d at 1321; Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). "Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision." Johnson, 268 F. Supp. 2d at 1321 (citing Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain the his basis of his decision)).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Johnson, 268 F. Supp. 2d at 1321; See Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding the Court may at any time order additional evidence to be taken before the Secretary upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding); See Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095; Johnson, 268 F. Supp. 2d at 1321.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095.

Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). "To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level." Green v Commissioner, 2007 WL 4287528 * 3 (M.D. Fla. Dec. 4, 2007) (citing Jackson, 99 F.3d at 1090 - 1092; *See also* Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994)). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] Id.

## DISCUSSION

The Plaintiff argues the ALJ improperly concluded his condition medically improved to the point where he could perform light work. As grounds, the Plaintiff cites to the following: (1) his medical record showing he has continuing back and knee pain and he has been diagnosed with continuing gallbladder problems, pancreatitis and emphysema;(2) asserts the ALJ erred in his RFC

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

determination; and (3) the ALJ's use of the Plaintiff's daily activities as a justification for terminating his benefits.  The Commissioner responds the ALJ supported his decision with substantial evidence and that the Plaintiff failed to produce any evidence to support his claim.

The Plaintiff was awarded disability benefits on January 29, 1993, finding the Plaintiff was disabled beginning on July 15, 1991.  On October 2, 2002, the Commissioner found the Plaintiff was no longer disabled and terminated his benefits beginning December 31, 2002.  Under the Social Security Act, once an individual is awarded disability benefits by the Social Security Administration (SSA), those benefits will cease upon a showing that there has been medical improvement related to the ability to work. 42 U.S.C. § 423(f), 42 U.S.C. § 1382c(a)(4).  The Social Security Act (the Act) states in pertinent part:

> [a] recipient of benefits . . . based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by–substantial evidence which demonstrates that:
>
> (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
>
> (B) the individual is now able to engage in substantial gainful activity

42 U.S.C. § 423(f)(1)(A)(B).  Once the claimant has introduced evidence that his or her condition remains the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling. Williams v. Apfel, 73 F. Supp. 2d 1325, 1337 (M.D. Fla. 1999).  The presumption of a continuing disability does not affect the ultimate burden of proof. Id.  It imposes on the Commissioner only the burden of going forward with

evidence to rebut or meet the presumption. Id. Once the burden to come forward has shifted to the Commissioner, the Commissioner must present evidence that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity. Id. (quoting Daring v. Heckler, 727 F.2d 64, 68-69 (3d Cir. 1984)).

Comparison of original medical evidence and new medical evidence is necessary to make a finding of improvement. Williams, 73 F. Supp. 2d at 1337 (citing Vaughn v. Heckler, 727 F.2d 1040, 1043 (11th Cir.1984)). The point of comparison is the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether claimant was disabled or continued to be disabled. 20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii).

Medical improvement is assessed by review of "symptoms, signs and laboratory findings." 20 C.F.R. § 416.994(b)(1)(i); 20 C.F.R. § 404.1594(b)(1). Symptoms are the claimant's description of impairments. 20 C.F.R. § 416.928; 20 C.F.R. § 404.1528. Signs are observable by medically acceptable clinical diagnostic techniques. 20 C.F.R. § 404.1528. Laboratory findings are from medically acceptable laboratory techniques. 20 C.F.R. § 404.1528.

### (1) Whether the Medical Records Evidence Demonstrates Medical Improvement

The Plaintiff claims that he continues to suffer back and knee pain as well as suffering from retinal tear, rotator cuff tendinosis, trace joint effusion, bilateral knee pain, mild prepatellar bursitis, chronic back pain, shoulder pain, instability, disc herniation, right knee hematoma, Radiculopathy with Myelopathy, pancreatitis, emphysema, depression, and a ruptured vertebra in his cervical spine. However, the Plaintiff's medical records do not support his claims.

After the extensive review of the record the ALJ held:

> I find the claimant has demonstrated medical improvement since October 2002, and that that improvement is related to the ability to perform work.  As of CPD, the claimant was suffering from a slight degree of anteroposterior laxity in the left knee and a marked degree of mediolateral laxity.  Since the CPD, evidence reveals that the claimant walks with an assistive device and x-rays of the left knee are essentially within normal limits showing the hardware intact and in good position.  In fact, one physician in 1996 opined that the claimant's left knee was gradually improving in strength [ ] and another stated that while it was a slight degree of anteroposterior laxity in the left knee weight bearing function of the left knee was truly normal and the claimant was not impaired from performing activities such as walking, sitting, bending and handling stairs [ ] In April 2001, claimant reported his left knee was doing well. At that time he left Dr. Gomez office without being seen as he could not wait any longer [ ] EMG and nerve conduction studies in August 2002 were considered normal with no evidence of neuropathy, myopathy or radiculopathy [ ].  Accordingly,  I find that as of October 2002, the claimant did demonstrate medical improvement. (Tr. 22).

Prior to reaching his conclusion, the ALJ performed an extensive review of the Plaintiff's medical records since his last favorable review in 1997.  The ALJ reviewed the medical record concerning the Plaintiff's numerous right and left knee exams and x-rays.  The ALJ noted the Plaintiff informed Dr. Gomez in April of 2001 that the left knee was doing well but that his right knee was in constant pain. (Tr. 19).  On August 1, 2002, Dr. Gomez reported the Plaintiff's EMG and nerve conduction study on his right knee were normal.  In November of 2002, the Plaintiff told Dr. Gomez the left knee was fine as long as he wore his knee brace. (Tr. 19).  The ALJ noted at that time that the examination of the left knee showed PCL laxity1+ with a good end point which was felt to be improved. (Tr. 19).  "The range of motion was essentially full on the right side." (Tr. 19).  "X-rays revealed well preserved joint spaces on both sides." (Tr. 19).  He also noted that there was little arthritic change. (Tr. 19).  On November 25, 2002, the Plaintiff got a magnetic resonance imaging

(MRI) scan on his right knee. (Tr.19).  The MRI showed no significant medial meniscus tear. (Tr. 19).  Dr. Gomez saw the Plaintiff on December 9, 2003, and opined that the Plaintiff's left knee did have some osteoarthritis but the knee was not significantly changed from the last study. (Tr. 20).

On February 27, 2003, the Plaintiff presented to Family Medical centers with back pain. (Tr. 19).  The Plaintiff was hospitalized but checked out of the hospital against medical advice. (Tr. 19). The Plaintiff returned to the clinic on September 18, 2003, with back pain, however, the Plaintiff's straight leg raise test was negative and there was no evidence of atrophy or reflex deficits. (Tr. 19).

Regarding the Plaintiff's shoulder, the ALJ noted that Dr. Gomez ordered a magnetic resonance imaging of that shoulder on September 17, 2003. (Tr. 20).  The results of that test confirmed rotator cuff tendinosis but no evidence of a tear was present and there was no significant instability, just some mild bursitis but no arthritis. (Tr. 20).  Dr. Gomez told the Plaintiff to stop wearing the shoulder immobilizer and to start an exercise program. (Tr. 20).  On February10, 2004, Dr. Gomez took more x-rays of the Plaintiff's shoulder. Dr. Gomez noted the Plaintiff continued to have shoulder problems, but again, x-rays of the shoulder showed the joint reduced but no bony abnormalities or fractures. (Tr. 20).

On March 18, 2004, the Plaintiff presented to Dr. Gomez complaining of knee pain after his dog ran between his legs and caused him to fall. (Tr. 20).  The ALJ noted the x-rays of the Plaintiff's knees showed no change compared to previous x-rays. (Tr. 20).

On March 30, 2004, Dr. Gomez took x-rays of the Plaintiff's lower back. (Tr. 20).  The result of that x-ray showed well preserved disc heights and spinal alignment and no obvious abnormalities. (Tr. 20).  Dr. Gomez followed up with an MRI on the Plaintiff's back.  The MRI did show moderate central disc herniation causing central canal stenosis and mild multilevel facet and ligamentous

hyprtrophic changes. (Tr. 20).

On July 20, 2004, the Plaintiff returned to Dr. Gomez after falling on a wet floor.  The x-rays of his left knee showed well preserved joint spaces on the right. (Tr. 20).  There was no further narrowing of the left joint spaces and the existing hardware was still intact and in good position. (Tr. 20).

On January 20, 2005, and February 3, 2005, the Plaintiff again had x-rays of his knees taken. (Tr. 20-21).  On January 20, 2005,  the x-rays showed no change from the previous film and the x-rays from February 3, 2005, confirmed the right knee had well preserved joint spaces with no obvious bony abnormalities or fractures noted. (Tr. 21).

The ALJ continued the Plaintiff's medical review and noted an examination from February 17, 2005, by Michael Sempsrott, ARNP and Lane R. Carlin, M.D., a neurologist. (Tr. 21).  The results of their exam showed the Plaintiff was in no acute distress and had normal motor strength in his upper and lower extremities, showed no acute distress, and had negative straight leg raise. (Tr. 21).  An examination from March 8, 2005, states the Plaintiff's condition was basically unchanged from previous exams. (Tr. 21).

The ALJ noted that while the Plaintiff complained of knee pain, all of the studies showed well preserved joint spaces and no obvious bony abnormalities or fractures. (Tr. 22).  The ALJ went on to note that no treating physician stated, since October 2002, that the claimant was disabled. (Tr. 22).  Dr. Gomez even reported in his notes that the Plaintiff's pain was "vague pain." (Tr. 22).  The ALJ observed that "while the Plaintiff was diagnosed with pancreatitis in early 2001, he currently seeks no treatment for this condition and in fact the medical records are devoid of any complaints regarding

his pancreatitis." (Tr. 22).  Additionally, the ALJ found that while the Plaintiff was diagnosed with "chronic obstructive pulmonary disease, no doctor ever noted any abnormal findings upon examination, and pulmonary function testing in October 2002 did not reveal any acute abnormalities." (Tr. 22).

The ALJ made a thorough review of the Plaintiff's medical records and provided tests results demonstrating the Plaintiff's medical improvement since the last favorable decision date in 1997. Consequently, the ALJ supported his decision with substantial evidence from the record.

### (2) Whether the ALJ Erred in his RFC Determination

RFC is what the claimant is still able to do despite his impairments, and is based on all relevant medical and other evidence. Vuxta v. Commissioner, 194 Fed. Appx. 874, 877-878, (11th Cir. 2006).  RFCs can contain both exertional and nonexertional limitations. Phillips v. Barnhart, 357 F.3d 1232, 1242-1243 (11th Cir. 2004). These limitations generally include a restriction to a particular physical exertion level, such as light, medium, or heavy, and a particular skill level, such as unskilled or semi-skilled. 20 C.F.R. §§ 404.1567-68.  The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)).  The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238.  That is, the ALJ must determine if the claimant is limited to a particular

work level. Id. (citing 20 C.F.R. § 404.1567).

The ALJ held the Plaintiff had the RFC to perform a wide range of light work.  Light exertional work is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category may require a good deal of walking or standing, or sitting most of the time, with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. Murphy v. Astrue, 2008 WL 126592 *4 (M.D.Fla. January 10, 2008) (citing 20 C.F.R. §§ 404.1567(b), 416.967(b)).

The Plaintiff argues, based upon the medical record, he could not perform light exertional work because of the walking and standing requirements.  However, the ALJ notes in his decision that no treating physician opined the Plaintiff was disabled after October 2, 2002. (Tr. 22).  The ALJ further noted ". . .the CPD evidence essentially reveals that the Plaintiff walks without an assistive device and x-rays of the left knee are essentially within normal limits showing the hardware intact and in good position." (Tr. 22).  The ALJ continued "[i]n fact, one physician in 1996 opined that the Plaintiff's left knee was improving in strength (Exhibit 2) and another stated while it is true that there was a slight degree of anteroposterior laxity in the left knee, weight bearing function of the left knee was truly normal and the claimant was not impaired from performing activities such as walking, sitting, bending, and handling stairs." (Exhibits B-17F) (Tr. 22).

The ALJ further relied on the opinion of the state agency physician who opined the Plaintiff could "lift and/or carry 20 pounds occasionally and lift and/or carry 10 pounds frequently; sit, stand and/or walk about six hours in an eight-hour work day; occasionally kneel and crouch but was to

24

avoid crawling." (Tr. 21).  In fact, the state agency consultant opined the Plaintiff was capable of

working at a medium level of exertion which requires lifting as much as 50 pounds occasionally and

25 pounds frequently; standing and/or walking six hours in an eight- hour work day and sitting up to

six hours in an eight- hour work day. (Tr. 21).  Thus, the ALJ supported his decision that the Plaintiff

had the RFC to work at the light exertional level with medical evidence from the record.

### (3) Whether the ALJ Erred In Citing to the Plaintiff's Daily Activities

The Plaintiff argues  the ALJ incorrectly used his daily activities to support his determination

that the Plaintiff was no longer disabled.  In his decision the ALJ stated "[i]n addition, while the

claimant alleges being totally incapacitated, he drives without restrictions, is able to get his children

ready for school, do household chores and cook . . . [h]e was able to take a trip to Boston . . . and

play basketball with his children." (Tr. 23).  The ALJ concluded "these wide and varied activities

further undermine the claimant's credibility." (Tr. 23).

While the performance of everyday tasks cannot be used to make a determination that the

Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in

regard to his ability to perform certain tasks. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir.

2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the

contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d

1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling

pain were not credible because of her daily activities demonstrated otherwise); Norris v. Heckler, 760

1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making

a credibility determination).  Here it is clear the ALJ used the Plaintiff's extensive activities to address

his credibility and not to make a medical finding regarding the Plaintiff's disability.

## CONCLUSION

Based upon the record and the ALJ's decision, the Court respectfully recommends the decision of the Commissioner to terminate the Plaintiff's disability benefits was supported by substantial evidence in the record and should be affirmed.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The decision of the Commissioner Finding the Plaintiff is No Longer Disabled and Terminating the Plaintiff's Disability Benefits should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this  26th  day of January, 2007.

*Sheri Polster Chappell*

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record, MJCD

26